Argued June 29, 1964, reargued May 6, affirmed
September 10, 1965

# PRICE *v.* GATLIN AND COLUMBIA
# TRACTOR & IMPLEMENT CO.

405 P. 2d 502

*Harrison M. Weatherford,* Albany, argued the cause for appellant. On the briefs were Weatherford, Thompson & Horton, Albany.

*Ernest Bonyhadi,* Portland, argued the cause for respondent. With him on the brief were Bonyhadi & Hall, Portland.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

GOODWIN, J.

This is an action for damages for economic loss resulting from the defective manufacture of a tractor. A jury found that because a new Ford tractor had failed to perform adequately the plaintiff had suffered $4,500 in damages to his business. Judgment was entered against the retail seller, but not against the wholesaler. (The manufacturer was not sued.) The purchaser appeals the judgment in favor of the wholesaler.

The only issue in this case is whether a purchaser of a defectively manufactured product, who is not in privity with the wholesaler, may recover for economic loss against a wholesaler through whose hands the product (or papers representing it) may have passed en route from the manufacturer to the retailer.

A purchaser, or even a stranger, who has sustained personal injuries may maintain an action for damages against a manufacturer whose defective work

causes bodily harm. Such a plaintiff is unembarrassed by a lack of contract privity, whether or not he must allege and prove negligence. See, e.g., *Wights v. Staff Jennings, Inc.* 241 Or 301, 405 P2d 624 (1965); *Strandholm v. General Const. Co.*, 235 Or 145, 157, 382 P2d 843 (1963).

This court has not yet held that a nonprivity purchaser may maintain an action against a manufacturer for economic loss, as distinguished from personal injury, caused by defective workmanship. That issue is not now before us, and we express no opinion upon the matter. This plaintiff is seeking to hold a wholesaler liable for innocently passing along a defective product. This he may not do.

The plaintiff alleges no fault or misrepresentation upon the part of the wholesaler. The plaintiff is frankly searching for a solvent defendant, in this state, whose liability is to be grounded solely upon the fact that he shares in the profits generated by the distribution of merchandise. The plaintiff argues that because the wholesaler makes a profit, even though he is free from fault, he should share in the economic burdens caused by the manufacturer's sale of a defective product.

If both privity and fault are irrelevant, the wholesaler would be liable, not for a duty he failed to perform, nor for the breach of a contract he never made, but because he happens to lie in the stream of commerce. Wholesalers in this state have had no reason to believe that they would be held liable to strangers, in unlimited amounts, when they are without fault. By whatever name it is called, this kind of liability is enterprise liability. We do not believe that the case at bar is a proper one in which to impose this new form of liability upon wholesalers.

318

■ We are not unaware of the authority which has been marshaled in support of the plaintiff's theory. We believe, however, that the social and economic reasons which courts elsewhere have given for extending enterprise liability to the victims of physical injury are not equally persuasive in a case of a disappointed buyer of personal property. See *Seely v. White Motor Company*, 45 Cal Rptr 17, 403 P2d 145 (1965).

■ We hold that a purchaser may not recover against a nonprivity seller, who is not alleged to be at fault in connection with the loss, for economic losses caused by a third party's defective workmanship.

Affirmed.

HOLMAN, J., specially concurring.

Causes of action brought by the consumer on the basis of the strict liability of manufacturers and wholesalers for damages resulting from the sale of goods of unmerchantable quality should be limited to those situations where the use of the defective product results in physical harm to persons or property. See the discussion in *Seely v. White Motor Co.*, 45 Cal Rptr 17, 403 P2d 145 (1965). In the past, the attaching of liability where there is no privity has been primarily for the benefit of persons physically injured by the defect. This is so whether responsibility was attached on the theory of enterprise liability, implied negligence through the doctrine of res ipsa loquitur, or implied warranty. Seldom has it been for solely economic loss.

What is the basis for distinguishing between the two? At first there seems to be no logical basis to distinguish them when they have resulted from the

same thing—the defective product. Probably the reason is social rather than legal, if the two can be distinguished. In establishing liability in personal injury cases courts have been motivated to overlook any necessity for privity because the hazard to life and health is usually a personal disaster of major proportions to the individual both physically and financially and something of minor importance to the manufacturer or wholesaler against which they can protect themselves by a distribution of risk through the price of the article sold. There has not been the same social necessity to motivate the recovery for strictly economic losses where the damaged person's health, and therefore his basic earning capacity, has remained unimpaired. To enforce strict liability for personal injuries because of such necessity and then to allow recovery for purely economic losses because they arise from the same defect is to apply the doctrine of strict liability when the original motivating factor therefor is not present. I doubt that it is wise to swing the door open to all who are disappointed with their purchase. They should be left for that kind of recovery to the one with whom they dealt.

For the reason stated above, I concur in the result of Justice GOODWIN's opinion.

O'CONNELL, J., dissenting.

Plaintiff introduced evidence from which the jury could infer that when the tractor was delivered by Columbia to Gatlin it was not fit for the general purpose for which it was manufactured and sold. This would be sufficient to establish Gatlin's liability based upon an implied warranty of merchantable quality. The question is whether Columbia is also liable upon such a warranty.

Columbia contends that there can be no liability for the breach of an implied warranty unless there is privity between the plaintiff and the defendant. In *Wights v. Staff Jennings,* 241 Or 301, 405 P2d 624 (1965), we held that under the appropriate circumstances strict liability could be imposed upon a seller for personal injuries resulting from the use of a defective product, even though the plaintiff was not in privity with the seller. In the present case the question is whether privity is essential when the defective product causes a pecuniary loss not involving a personal injury and not arising out of an accident.

I would distinguish between (1) cases in which the defect causes an accident resulting in personal injury or property damage, and (2) cases in which the defect causes a pecuniary loss not arising out of an accident. In the first group of cases, applying the traditional tests of tort liability, defendant's duty may be expressed in terms of his obligation to refrain from intentional, negligent or abnormally dangerous conduct creating a risk of physical harm to persons or property.[1] In the second group of cases defendant's duty is to be expressed in terms of his obligation to refrain from intentional, negligent or innocent misstatements of fact which cause a pecuniary loss divorced from a tangible harm.

Under (1) above a seller, whether or not he is in privity with the plaintiff, is liable just as any one else is liable for intentional, negligent or abnormally

---

[1] The liability under this category of tort may extend to cases where misrepresentation has some causal connection with the injury. See Restatement (Second), Torts, § 402B (Tent. Draft No. 6, 1961), imposing liability upon a dealer for physical harm to a consumer caused by justifiable reliance upon an innocent misrepresentation concerning the quality of the chattel sold.

dangerous conduct. Whether he is liable beyond this need not be determined in the present case.[2] The present case falls under group (2) above. Here plaintiff is complaining that defendants misrepresented their product and that as a result of the misreprentation plaintiff was deceived. It is not alleged that the defendants either intentionally or negligently misrepresented the condition of the tractor. It is not, therefore, an action of deceit, nor, if recognized, an action for negligent misrepresentation.[3] The complaint is couched in terms of a breach of implied warranties of fitness for a particular use and of merchantable quality. In effect, it charges defendants with making an innocent misrepresentation of fact.[4]

Strict liability in tort for an innocent misrepresentation of fact has been recognized in certain types of transactions.[5] Such liability has long existed in the law of sales under the notion of "warranty." But, as we observed in *Wights v. Staff Jennings,* supra, since warranty was regarded as an aspect of contract law the tort principles underlying the strict liability were not clearly identified. It was not necessary, therefore, to explain why there should be strict liability in tort for innocent misrepresentations concern-

---

[2] We refrained from deciding this question in Wights v. Staff Jennings, 241 Or 301, 405 P2d 624 (1965).

[3] See Restatement (Second), Torts, § 552 (Tent. Draft No. 10, 1964) which imposes liability upon one who in certain cases supplies false information for the guidance of others in their business transactions if "he fails to exercise reasonable care or competence in obtaining or communicating the information."

[4] "Warranties derived from representations with no promissory element are a form of liability for honest misrepresentation." Note, Disclaimers of Warranty in Consumer Sales, 77 Harv L Rev 318, 320-21 (1963).

[5] See Prosser, Torts, § 102, pp. 724-25 (3d ed 1964).

ing the quality of goods and not in most other commercial dealings.[6]

What is the policy which calls for the imposition of strict liability upon the seller of goods? Certainly, liability should not be imposed simply because the seller is more capable of distributing the loss. As we noted in *Wights v. Staff Jennings,* supra, the application of that principle would result in imposing strict liability upon the seller for all of his commercial activities resulting in a loss to a third person. However, there are other grounds for imposing strict liability upon one who in the course of marketing goods causes intangible economic harm (as distinguished from personal injuries or property damage arising out of an accident). I am not concerned here with the isolated sale of a chattel by one neighbor to another. I am speaking of the liability which arises out of the sale of goods by one who is engaged in the business of selling goods of the kind involved in this transaction, whether he is a manufacturer, distributor or retailer.

The gist of the tort is a representation by the dealer justifiably relied upon by the purchaser. The representation giving rise to liability is, in effect, the same as that found in the implied warranty of merchantable quality, i.e., that the goods sold conform to the standard of quality generally attributable to goods of that description, and that they are reasonably

---

[6] See Prosser, Torts, § 102, p. 725 (3d ed 1964), where it is observed that "Any demand for the application of the principle [of strict liability] to other transactions found the concept of warranty rigidly defined * * *." Prosser adds, however, that "nevertheless, a large group of the American courts have succeeded in prying open the door, and extending strict liability to express representations made in the course of other commercial dealings, such as the sale of land, securities, or patent rights."

fit for the purpose for which they are designed.[7] The representation of quality may take a variety of forms; it may be by way of an express written "warranty" cast in promissory language, or through labels and advertising. And when a dealer offers goods which are purported to be of a certain kind, the mere placing of these goods upon the market may constitute a representation of reasonable fitness as goods of that character.[8] Whatever their form, when these assurances create in the purchaser a reasonable expectation that the goods will meet the standard of quality represented there is a basis for tort liability. The statement in 2 Harper and James, § 28.20, p. 1579 (1956) comes close to hitting the mark:

> "An insistence on reliance is natural enough in shaping a remedy for trade losses in commercial transactions. A cardinal aim of contract and commercial law is to assure a man of the fulfillment of reasonable expectations induced by the apparently promissory conduct of another. In such a context questions of reliance come very near to the heart of the matter. Expectations are born of reliance."[9]

The idea that strict liability for purely pecuniary losses may be predicated upon a theory of actionable

---

[7] See Prosser, The Implied Warranty of Merchantable Quality, 27 Minn L Rev 117, 130 (1943).

[8] "In the usual dealer sale, however, it cannot reasonably be thought that the buyer is willing to pay good money for whatever the seller will give him, and remain completely at the seller's mercy. While he is notified that the thing delivered may have its faults and defects, he at least understands that it is an article of the kind described in the contract, and that what purports to be glassware is not in reality pickled fish or toy balloons." Prosser, The Warranty of Merchantable Quality, 27 Minn L Rev 117, 159 (1943).

[9] By contrast, the authors hasten to point out that inducement through the seller's representation is not of significance in cases involving casualty losses.

representations is found elsewhere as well. Thus in *Randy Knitwear, Inc. v. American Cyanamid Co.*, 11 NY2d 5, 181 NE2d 399, 402 (1962), the fact that the manufacturer of chemical resins advertised widely was treated by the court as a significant factor in imposing liability. The court said:

"The world of merchandising is, in brief, no longer a world of direct contract; it is, rather, a world of advertising and, when representations expressed and disseminated in the mass communications media and on labels (attached to the goods themselves) prove false and the user or consumer is damaged by reason of his reliance on those representations, it is difficult to justify the manufacturer's denial of liability on the sole ground of the absence of technical privity. Manufacturers make extensive use of newspapers, periodicals and other media to call attention, in glowing terms, to the qualities and virtues of their products, and this advertising is directed at the ultimate consumer or at some manufacturer or supplier who is not in privity with them. Equally sanguine representations on packages and labels frequently accompany the article throughout its journey to the ultimate consumer and, as intended, are relied upon by remote purchasers. Under these circumstances, it is highly unrealistic to limit a purchaser's protection to warranties made directly to him by his immediate seller. The protection he really needs is against the manufacturer whose published representations caused him to make the purchase."[10]

---

[10] Although Baxter v. Ford Motor Co., 168 Wash 456, 12 P2d 409, 15 P2d 1118 (1932), involved a personal injury, it is perhaps even closer to the case at bar with respect to the misrepresentation. There, the court held that the manufacturer was liable to a remote purchaser for a breach of warranty on the ground that the purchaser had a right to rely upon representations made by the manufacturer in its sales literature. "It would be unjust to recognize a rule that would permit manufacturers of goods to create a demand for their products by representing that they

The purchaser can recover only if he justifiably relies upon the seller's representation of quality. But justifiable reliance in this context has a special meaning. Reliance which would not be regarded as justifiable in an ordinary action of deceit may be sufficient where, as here, the purchaser is not in an entirely free bargaining position. In purchasing a motor vehicle he must accept the seller's terms as to liability for defects or go without the vehicle because these terms are more or less uniformly employed throughout the industry. The point is elaborately developed in *Henningsen v. Bloomfield Motors, Inc.,* 32 NJ 358, 161 A2d 69, 75 ALR2d 1, 23 (1960). There it is said:

"The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality. In such a society there is no danger that freedom of contract will be a threat to the social order as a whole. But in present-day commercial life the standardized mass contract has appeared. It is used primarily by enterprises with strong bargaining power and position. 'The weaker party, in need of the goods or services is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood in a vague way, if at all.' Kessler, 'Contracts of Adhesion—Some

possess qualities which they, in fact, do not possess; and then, because there is no privity of contract existing between the consumer and the manufacturer, deny the consumer the right to recover if damages result from the absence of those qualities, when such absence is not readily noticeable." 168 Wash 456, 462-63, 12 P2d 409, 412.

Thoughts About Freedom of Contract,' 43 Colum L Rev 629, 632 (1943); Ehrenzweig, 'Adhesion Contracts in the Conflict of Laws,' 53 Colum L Rev 1072, 1075, 1989 (1953). Such standardized contracts have been described as those in which one predominant party will dictate its law to an undetermined multiple rather than to an individual. They are said to resemble a law rather than a meeting of the minds. Siegelman v. Cunard White Star, 221 F2d 189, 206 (2d Cir 1955)."[19]

When it is said that the seller misrepresents his product in spite of a disclaimer of liability for defects (except those included within an express warranty) and that a purchaser justifiably relies upon the representation in spite of his knowledge of the disclaimer, perhaps it is a distortion of language to speak of this as a tort based upon misrepresentation. If it is, then I would describe the tort simply in terms of a policy prohibiting the imposition of an unfair "bargain" upon members of the public who are forced to buy a needed product.[20] That policy is buttressed by con-

---

[19] See also, Vold, Law of Sales, 447 (2d ed 1959).

[20] "In essence, it may be said that strict liability on retailers comports harmoniously with contemporary ideas of fairness and with what the buyer may reasonably expect from a modern and highly integrated commercial world." Retailer and Manufacturer Liability in Germany and the United States for Personal Injury from Defective Products, 1959 Duke L J 94, 108.

It has been suggested that the "bargain" imposed upon consumers is unfair in another respect. "The seller's statements about the goods usually defines the sale, not only because they indicate his intention but because from such statements the expectations of the buyer may be inferred. If a disclaimer contradicts the expectations arising from statements or affirmations of the seller, the disclaimer should fail. The seller may not give with one hand and snatch away with the other." Note, Limitations on Freedom to Modify Contract Remedies, 72 Yale L J 723, 738 (1963). See also Boshkoff, Some Thoughts About Physical Harm, Disclaimers and Warranties, 4 Boston College Industrial and

siderations other than fairness. It has been suggested that the imposition of strict liability upon the seller can be justified on the ground that it is "for the sake of the general welfare in promoting economy, speed and efficiency in the marketing system,"[13] and tends "to improve marketing conditions regarding quality of goods."[14] The fact that the seller is better able to distribute the loss may be added as another consideration favoring the imposition of a form of strict liability upon the seller.[15]

---

Commercial L Rev 285, 305-307 (1963); Henningsen v. Bloomfield Motors Inc., 32 NJ 358, 400, 161 A2d 69, 93, 75 ALR2d 1 (1960).

Jaeger, Products Liability: The Constructive Warranty, 39 Notre Dame Lawyer 501, 555 (1964) states: "In a rapidly expanding industrial and mechanical economy * * * it is high time that public policy looked out for the consumer since he is no longer able to look out for himself." Jaeger suggests that we recognize "a separate and distinct action of breach of warranty which will depend neither upon contractual requirements nor tort considerations." This tort he would call "the constructive warranty." I believe that it is preferable to recognize two separate torts, one arising out of a risk of physical harm and property damage and the other out of a form of misrepresentation.

[13] Vold, Law of Sales, 439 (2d ed 1959). The results of an early survey suggest that business practice may corroborate this view: "* * * [T]he ordinary buyer gets the benefit of the common maxim, 'the buyer is always right.' The reports contain strong evidence that the modern seller will go to great lengths to please his customers. In practice he does not stop at his legal obligations, but takes any reasonable steps to retain good will. The strict letter of the law is enforced by the seller only against buyers who are exceedingly unreasonable or are strongly suspected of fraudulent practices." Bogert and Fink, Business Practices Regarding Warranties in the Sale of Goods, 25 Ill L Rev 200, 415-16 (1930).

[14] Vold, Law of Sales, 436 (2d ed 1959); Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal2d 453, 462, 150 P2d 436, 440 (1944) (concurring opinion); James, General Products—Should Manufacturers be Liable Without Negligence?, 24 Tenn L Rev 923 (1957).

[15] Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal2d 453, 462, 150 P2d 436, 440 (1944) (concurring opinion). See also authorities cited in footnote 8 in Wights v. Staff Jennings, supra.

The view I take here is supported by *Santor v. A. and M. Karagheusian, Inc.*, 44 NJ 52, 207 A2d 305 (1965). However, in a more recent case, *Seely v. White Motor Co.*, 45 Cal Rptr 17, 403 P2d 145 (1965), the California Supreme Court refused to apply the theory of strict liability in tort to a case involving an economic loss not arising out of an accident. The court recognized that strict liability may be imposed where the defect in the product causes an accident which results in physical injury to person or property. In the case of a non-accidental loss, liability rests upon a breach of warranty according to *Seely*. It is not clear from the majority opinion in *Seely* just what constitutes the basis for imposing liability upon the remote seller, i.e., whether it is a form of contractual liability or some aspect of tort liability based upon fault. The manufacturer was held liable in spite of the fact that there was no contractual relation between the manufacturer and the plaintiff. And there was no evidence to show that the plaintiff relied upon the manufacturer's warranty. It would seem that in such a case the liability could not be predicated upon a contract between the plaintiff and defendant but would have to arise out of a tort of some kind. Since the liability is not related to the fault of the manufacturer, it is appropriate to describe the tort in terms of "strict liability." The dissent in *Seely* reaches this conclusion and in my opinion clearly isolates the fallacy in the principal opinion.

Columbia contends that even if the privity requirement is dispensed with in an action against the manufacturer of a product, it should be retained to protect a wholesaler or distributor from actions by remote purchasers. A few cases have allowed recovery against the wholesaler for personal injuries resulting from a

defectively manufactured chattel.[66] The contrary view has been taken in states where recovery against manufacturers has been permitted.[67] I have examined these conflicting authorities and the commentaries upon them.[68] The treatises on torts express the view that the distributor should be held to the same strict liability which is imposed upon the manufacturer and the retailer. Prosser on Torts, p. 682 (3d ed 1964), observes that "All of the valid arguments supporting strict liability would appear to apply with no less force against both kinds of dealers [referring to retailers and wholesalers]; and there are enough cases where the manufacturer is beyond the jurisdiction, or even unknown to the injured plaintiff, to justify giving the consumer the maximum of protection, and requiring the dealer to argue out with the manufacturer any questions as to their respective liability. Particularly today when the large wholesale supply house or even the retail chain is often actually the prime mover in marketing the goods, and the manufacturer only a small concern which feeds it, there is no reason to

[66] Prosser, Torts, 682 (3d ed 1964), states: "There are few decisions as to wholesalers, but the indications are that they are to be held also," citing Swengel v. F. & E. Wholesale Grocery Co., 147 Kan 555, 77 P2d 930, 935 (1938); Graham v. Bottenfield's Inc., 176 Kan 68, 269 P2d 413 (1954); Nelson v. West Coast Dairy Co., 5 Wash2d 284, 105 P2d 76, 130 ALR 606 (1940); Hoskins v. Jackson Grain Co., 63 So2d 514 (Fla 1953) (dictum); Davis v. Radford, 233 NC 283, 63 SE2d 822, 24 ALR2d 906 (1951) (dictum).

[67] Elmore v. Grenada Grocery Co., 189 Miss 370, 197 So 761 (1940); Bowman Biscuit Co. v. Hines, 151 Tex 370, 251 SW2d 153 (1952); Degouveia v. H. D. Lee Mercantile Co., 231 Mo App 447, 100 SW2d 336 (1936).

[68] Note, 30 NC L Rev 191 (1952); Note, 31 Tex L Rev 594 (1953); Comment, 1953 Wash U L Q 327; Note, The Wholesaler's Liability to the Consumer for Injury Due to Defective Goods, 1955 Wash U L Q 380, 392-98.

draw distinctions between different kinds of sellers."⑱ It has been observed that the marketing of automobiles is an integrated process which begins with the manufacturer and moves down the line through the distributor to the retailer. They, in effect, constitute one selling organization.⑲ Although they do not stand strictly in the relation of principal and agent, the representations each makes are, it is said, essentially the representation of the others.

Accepting this view, the wholesaler who participates in the representations of quality and shares in the profits from marketing tractors should be made to respond in damages if the buyer's reasonable expectations are not realized.

In the present case the evidence establishes that Columbia attempted to promote the sale of Ford tractors by advertising. Thus the representation to prospective purchasers was made directly by the distributor. I believe that liability should be imposed under these circumstances. It is not necessary to decide whether the distributor would be liable if he did not advertise his product. The lower court's instructions to the jury were based upon the theory that Columbia could be held liable only if it were an agent for the

---

⑱ See also 2 Harper and James, Law of Torts, 1602 (1956): "For the most part the same considerations that call for strict liability of the retailer also support strict liability of the wholesaler to the victim." See also Note, The Marketing Structure and Judicial Protection of the Consumer, 37 Colum L Rev 77 (1937).

⑲ Cf., Gillam, Products Liability in the Automobile Industry, 18 (1960): "The dealer, then, is not really very independent. He functions as part of the manufacturer's sales organization. His independence is nominal and legal; it is a fiction, a problem in corporate personality. In economic reality the dealer is merely the conduit through which the goods flow; the manufacturer sells the goods to the public through the dealer." The same may be said of the distributor.

manufacturer or the retailer. In my opinion this was reversible error.

Columbia argues that plaintiff invited the error because the case was tried solely on the theory that Columbia was an agent for the manufacturer, Ford Motor Co., or the retailer Gatlin. I do not agree. Plaintiff's complaint and the evidence were sufficient to embrace the theory of non-privity liability based upon implied warranty (which we have translated into the theory of strict liability). Plaintiff's exceptions to the instructions in question clearly brought to the trial court's attention plaintiff's contention that Columbia was liable in spite of the absence of privity between it and plaintiff.

Plaintiff sought damages for (1) the amount that he had paid for the tractor ($2,395.40) and (2) for the loss of profits resulting from the loss of use of the tractor ($8,000). Damages for the amount paid for the tractor were based upon the theory that the tractor was so defective that "the said machine has no value." Whether the action is conceived of as one in contract, with privity, or one in tort, without privity, plaintiff should be entitled to recover the difference between the value of the chattel he received and the amount that he paid for it.

Treating the action as one for an innocent misrepresentation of fact, the measure of damages would be in tort. Had plaintiff brought a suit in equity for rescission he would have been entitled to be placed in status quo ante, which, in this case, would be the price paid for the tractor if plaintiff's contention that it was of no value is accepted.

Where recovery is sought in an action at law for the difference between the price paid and the value received, the action is, as pointed out by Seavey,

"substantially one for rescission."[20] Therefore, the measure of damages should be the same.[21]

Plaintiff should be entitled to recover in an action at law the difference between the price he paid for the tractor and the value of the tractor he received. But what of plaintiff's claim for damages resulting from the loss of use of the tractor, i.e., for loss of profits? In an action based upon the theory of an implied warranty this court has held that the plaintiff may recover for loss of profits if (a) they could be regarded as having been within the contemplation of the parties, and (b) the loss could not reasonably have been prevented by the plaintiff.[22] Such a rule of damages is equally appropriate to an action based upon the theory of strict liability in tort.[23]

The judgment should be reversed and the cause remanded for a new trial.

SLOAN and DENECKE, JJ., join in this dissent.

---

[20] Seavey, Actions for Economic Harm—A Comment, 32 N Y U L Rev 1242, 1244 (1957). See Aldrich v. Scribner, 154 Mich 23, 117 NW 581 (1908) (allowing an action for deceit against an innocent misrepresenter who received the profits of his misrepresentation).

[21] See, P. Keeton, Actionable Misrepresentations: Legal Fault as a Requirement, Rescission, 2 Okla L Rev 56, 57 (1949).

[22] Western Feed Co. v. Heidloff, 230 Or 324, 370 P2d 612 (1962); American Oil Etc. Co. v. Foust, 128 Or 263, 274 P 322 (1929). Compare the language of the Uniform Commercial Code, ORS 72.7150 (2) (a). Liability for loss of profits upon the breach of an implied warranty is recognized in Seely v. White Motor Company, 45 Cal Rptr 17, 403 P2d 145 (1965).

[23] Cf., Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L J 1099, 1144 (1960).